Exhibit 3

01

1                    UNITED STATES DISTRICT COURT

                      MIDDLE DISTRICT OF FLORIDA

2                         ORLANDO DIVISION

3                             — — —

4

5      ABSEN, INC.,                    Case No.:

6                   Plaintiff,      6:19-cv-905-Orl-40LRH

7             vs.

8      LED CAPITAL, LLC and

       MARCEL DEKEYZER,

9

                    Defendants.

10

                    --------------

11                   July 20, 2020

                    --------------

12

13          Oral sworn deposition of MARCEL DEKEYZER,

14     65 Rolling Hill Drive, Chatham, New Jersey,

15     07928, taken remotely, before Patricia R. Frank,

16     Certified Court Reporter and Notary Public of the

17     State of New Jersey, commencing at 11:00 a.m., on

18     the above date.

19

20                            — — —

21

22

23

24

25

Page 2

A P P E A R A N C E S :
(All parties appearing remotely via video conference.)

MAZZOLA LINDSTROM LLP
BY: JEAN-CLAUDE MAZZOLA, ESQUIRE
    RICHARD LERNER, ESQUIRE
1350 Avenue of the Americas
Second Floor
New York, NY 10019
646.216.8585
646.813.4345
jeanclaude@mazzolalindstrom.com
richard@mazzolalindstrom.com
Attorneys for Plaintiff
MARCEL DEKEYZER,
Defendant Pro SE

Page 3

I N D E X

Witness                           Page
MARCEL DEKEYZER
  By Mr. Mazzola                    4

E X H I B I T S

Marked for I.D.                   Page
Exhibit A      Subpoena             8
Exhibit B      Subpoena             8

(Exhibits retained)

Page 4

MARCEL DEKEYZER,
having been duly sworn, was examined and
testified as follows:
BY MR. MAZZOLA:
    Q.   Okay.  Good morning, Mr. Dekeyzer.  We've
met before.  My name is J.C. Mazzola.  I'm an
attorney.  I represent Absen, Inc.  And I'm going to
be asking you a series of questions related to a
default judgment that was obtained by Absen, Inc.
against LED Capital, LLC, and yourself individually.
        Do you understand that?
    A.   Yes.
    Q.   And do you understand that you're here to
answer questions in connection with the two
subpoenas that were served upon you?
    A.   Yes.
    Q.   Prior to sitting down for the deposition
today, did you have an opportunity to review those
subpoenas and the questions that were to be answered
under oath?
    A.   I have -- had very little time to review
this so I think -- I went over it quickly.  I think
I can answer most.  Maybe some things I have to
circle around.  I've not been able to get legal
advice for this deposition, so, that's it.  That's

Page 5

just -- whatever.
    Q.   Well, Mr. Dekeyzer, you were provided
with adequate notice; is that correct?
    A.   Let's say for -- where I was, to
really get a lawyer introduced in this case and get
me to advise on everything, I would have needed more
time, but I'm not saying I would have done that if I
had more time.
    Q.   Okay.  Well, Mr. Dekeyzer, you understand
that we initially met with you in June and we served
the subpoenas on you personally in June.
        Do you remember that?
    A.   Let me say that since that we have pretty
much had conversations to -- for a settlement, a new
contract, that we have been discussing intensively.
I think there is e-mails with that.
    Q.   Mr. Dekeyzer --
    A.   There was e-mails with a preliminary
agreement.  So I wasn't really sure if this was all
necessary to go on with.  I thought the way we were,
without lawyers, and I'm a little surprised at this
point you are continuing with, but I guess I cannot
really -- that's just what it is.
    Q.   We have met before; that's correct,
right?

Page 6

1    A.    Yes, of course.
2    Q.    And we've had various conversations
3 probably going back about 60 days; is that correct?
4    A.    I don't know.  We met somewhere like a
5 month ago.  That's what I know.
6    Q.    Okay.  Mr. Dekeyzer, I'm just sort of
7 laying a foundation over here, okay?
8    A.    I have no problem.
9    Q.    And to make things a little bit easier,
10 because we've met, you can call me J.C. and I'll
11 call you Marcel.  Is that okay?
12    A.    I really like Jean-Claude more, to be
13 honest with you.
14    Q.    Jean-Claude is fine, Marcel.  Okay.
15 There are just a couple of things I want to clarify
16 with you.  The subpoenas that you're here for to
17 answer questions on, these were served to you at
18 your home some time in May; is that correct?
19    A.    I don't know.  I have not seen anything,
20 but I've not been home a lot so I have not seen
21 anything served to my home.
22    Q.    Marcel, that notwithstanding, you and I
23 did meet either on June 9, 8, somewhere around that
24 day, and I gave you a copy of these subpoenas; is
25 that correct?

Page 7

1    A.    I don't remember that.  You gave me some
2 papers.  I know you gave me a stack, but I never
3 really looked at it.
4    Q.    Okay.  But you do acknowledge that you
5 received these subpoenas at some point; is that
6 correct?
7    A.    I got an e-mail I think from one of your
8 colleagues with a digital copy of questions.
9    Q.    Can you show me the subpoenas you have in
10 front of you?
11    A.    No, I don't have any.
12    Q.    You don't have any.
13    A.    I have no problems answering the
14 questions.  It's more like ...
15    Q.    So you're fine to proceed then; is that
16 correct?
17    A.    Yes, of course.  I mean I wouldn't be
18 here if I wasn't fine to --
19    Q.    There's a few things that I have to do
20 procedurally before we get started.
21    MR. MAZZOLA:  And, Patty, I don't know
22 how we do this now, but there are two subpoenas.  It
23 sounds like Mr. Marcel does not have them in front
24 of him.  But I'm going to mark them,
25 notwithstanding, as Exhibit A and Exhibit B.

Page 8

1    (Discussion off the record.)
2    MR. MAZZOLA:  And I'm going to mark them
3 right now with a black magic marker.
4    (Subpoenas marked Exhibit A and Exhibit
5 B for identification.)
6 BY MR. MAZZOLA:
7    Q.    Now, Marcel, you said earlier that you're
8 not represented by counsel; is that correct?
9    A.    Um-hum.
10    Q.    You understand that you had a right to
11 obtain counsel; is that correct?
12    A.    Correct.
13    Q.    Okay.  And you understand that you're
14 agreeing this morning to proceed without counsel; is
15 that correct?
16    A.    Correct.
17    Q.    A couple of ground rules before we
18 proceed with this deposition before I get into the
19 questioning, okay, Marcel?  Would you listen?
20    A.    All right.  I am.
21    Q.    The first rule is that we need you to
22 give audible responses.  So you have to say yes or
23 no, because, otherwise, the court reporter can't
24 record it, okay?
25    A.    Okay.

Page 9

1    Q.    Okay.  The second rule is, if you need a
2 break or anything, just let me know, and we can take
3 a break.  Do you understand that?
4    A.    Yes.
5    Q.    And the third rule is, everything you say
6 has to be truthful and honest, okay?  Do you
7 understand that?
8    A.    Yes, I understand that.
9    Q.    Okay.  And if you should lie in the
10 deposition, you could subject yourself to a charge
11 of perjury.  Do you understand that?
12    A.    Yes.  I mean, yes.
13    Q.    If I ask you a question and you don't
14 know the answer to it, just let me know "I don't
15 know the answer to it."
16    A.    Correct.
17    Q.    If I ask you a question and you say
18 there's a document that might better help you answer
19 that question and you have that document to hand,
20 feel free to go get it or look at it, okay?
21    A.    Okay.
22    Q.    Okay?  Did you want to say something?
23    A.    Well, I want to see like is there some
24 kind of procedure that if like certain things I
25 don't know exactly the information, that I can

Page 10

1   like -- that we can just strike it and I can provide
2   it to you in -- let's say in an e-mail or a second
3   call, a second deposition?  Is there any kind of
4   procedure that's --
5       Q.   Let's see how we go, Marcel, okay?  See
6   how this goes this morning.
7       A.   Okay.
8       Q.   So you understand that primarily the
9   questions that I'm going to be asking you today
10  relate to the judgments that have been obtained
11  against you personally and against LED Capital?
12      A.   Yeah.
13      Q.   So presently you're sitting in your home;
14  is that correct?
15      A.   Correct.
16      Q.   And that's in Chatham, New Jersey?
17      A.   Correct.
18      Q.   What is the address?
19      A.   64 Rolling Hill Drive -- I gave it to the
20  court reporter already -- Chatham, New Jersey,
21  07928.
22      Q.   Do you own the home?
23      A.   Yes.  With a mortgage.
24      Q.   Do you own that home individually, or do
25  you own that home in some sort of joint capacity

Page 11

1   with your wife?
2       A.   With my wife.
3       Q.   What's your wife's name?
4       A.   Cynthia.
5       Q.   What's her last name?
6       A.   Dekeyzer.
7       Q.   And how do you spell your name?
8       A.   D-E-K-E-Y-Z-E-R.
9       Q.   I recall you saying that there were
10  various spellings to your name; is that correct?
11      A.   There's only one spelling because that's
12  what is in my passport, but, yes, when -- the name
13  in my green card, the I and the J is replaced by a
14  Y.  That's the difference, the main difference.  And
15  the space -- sometimes between the DE and the K
16  there is a space, like people that have like Van as
17  a last name.
18          So the only difference really is the
19  space between DE and K that sometimes is there and
20  sometimes isn't, and the I and the J as a Y, you
21  know, replaced by a Y.
22      Q.   Do you have a driver's license?
23      A.   D-E-K-E-Y-Z-E-R.  There's only one name I
24  really use everywhere.
25      Q.   What's your passport name?

Page 12

1       A.   D-E-K-E-I-J-Z-E-R.  So the only
2   difference is between the name in my passport and
3   the name that I have always used when I am in the
4   U.S., green card, driver's license.  Even my
5   children and my wife are with the K-E-Y-Z-E-R name.
6           So their passport is different -- their
7   name in their passport, U.S. passport, is different
8   than my name in my Dutch passport.  It should have
9   never happened, but that's just something that
10  happened when I got my green card where they didn't
11  put the same name in it as I have on my passport
12  so ...
13      Q.   What is your wife's maiden name?
14      A.   Zeits, Z-E-I-T-S.
15      Q.   Z-E-I-T-S.
16      A.   Yeah.
17      Q.   Does your wife have a middle name?
18      A.   Marie.
19      Q.   Marie.
20      A.   Yeah.
21      Q.   Do you have a middle name?
22      A.   No.
23      Q.   You mentioned you have children; is that
24  correct?
25      A.   Yep.

Page 13

1       Q.   How old are they?
2       A.   I will tell you exactly when they're
3   born.  March 2001, I think he's like 19 or almost
4   19, Julian.  Sophie is born February 4, '98.
5       Q.   She's twenty-two?
6       A.   Probably 22 already.  And Emilie is born
7   on October 12, 1999.
8       Q.   She's 21.
9       A.   She's 20.  She's not 21 yet.  She'll be
10  21 in the fall.
11      Q.   What were their names again?
12      A.   Julian.
13      Q.   Julia is how old?
14      A.   Julian, J-U-L-I-A-N.  No middle name.
15      Q.   Does he have a middle name?
16      A.   Nope.
17      Q.   Okay.
18      A.   He is the youngest.
19      Q.   How old is your 22-year-old, your oldest?
20      A.   She's 22.
21      Q.   I mean, I'm sorry, what is her name?
22  What is her name?
23      A.   Sophie, S-O-P-H-I-E.
24      Q.   Does Sophie have a middle name?
25      A.   Marie.

Case 2:22-cv-02158-KM-AME   Document 1-4   Filed 04/13/22   Page 6 of 30 PageID: 20

Page 14

1    Q.    Marie.

2    A.    I think my two girls have a middle name
3 but I barely know them, but I'm almost 99 percent
4 sure it is Marie.  And Emilie, the middle child,
5 she's the one born in October '99.  She's 20.  And
6 her middle name is Ann, ANN, I think.

7    Q.    Ann.

8    A.    Emilie Ann, yeah.

9    Q.    How do you spell her name?

10    A.    E-M-I-L-I-E.

11    Q.    My daughter's name.

12    A.    Yep.  Middle child.

13    Q.    Where do your children live?

14    A.    They go to college, so one lives in
15 Auburn.  One lives in Charleston.

16    Q.    Who lives in Auburn?

17    A.    Sophie lives in Auburn.

18    Q.    What college does she go to?

19    A.    University of Auburn or Auburn.  And
20 she's finished actually so she's not going there
21 anymore.  She graduated.

22    Q.    Where does she live?

23    A.    She still lives there because she'll have
24 a second graduation ceremony supposed to happen now
25 on the 8th of August because of the delay.  You

Page 15

1 know, they're trying to do a graduation ceremony on
2 the 8th of August.  So after that, it's not very
3 clear to me where she's going to live.

4    Q.    Marcel, what is your Social Security
5 number?

6         (Discussion off the record.)

7         THE WITNESS:  Can you read this?

8         MR. MAZZOLA:  253-97-####.

9         THE WITNESS:  I thought I was ready to
10 keep it out of the official record or something but
11 I guess not.

12         MR. MAZZOLA:  It is out of the official
13 record, Marcel.  Patty is not going to write down
14 the last four digits.

15         THE WITNESS:  How long do you think this
16 is going to last?  I mean it guess it depends on how
17 I answer but --

18         MR. MAZZOLA:  Yeah, it could be a couple
19 of hours, but we can take a break if you'd like.

20         THE WITNESS:  No.  If I need to do a
21 break, then it will be part two on a different date?
22 Is that possible or --

23         MR. MAZZOLA:  Let's see how far we get,
24 okay, Marcel we'll work with you, okay?

25         THE WITNESS:  No.  I want to finish it

Page 16

1 so it's not -- I just have somewhere else I want to
2 go -- have to go this afternoon but I'm --

3 BY MR. MAZZOLA:

4    Q.    The home at 64 Rolling Hills --

5    A.    Yes.

6    Q.    -- what is the approximate value of that
7 house?

8    A.    1.4.

9    Q.    And that house is currently on the market
10 for sale?

11    A.    Yeah.

12    Q.    Who is the listing broker?

13    A.    I think it's Coldwell.

14    Q.    Coldwell?

15    A.    But you can easily -- you can go to MLS
16 and type in the address and it will show up.  So
17 it's ...

18    Q.    Do you have any offers to purchase the
19 house?

20    A.    We might get one in the next -- but so
21 far no offers, no.  We have a neighbor who wants to
22 buy it but not -- he's waiting for his green card to
23 come through.  So there's a couple of things but ...

24    Q.    You said the house has a mortgage on it;
25 is that correct?

Page 17

1    A.    Yep.

2    Q.    What bank holds the mortgage?

3    A.    Citizen.

4    Q.    Citizens?  How much, if you know, is left
5 on the mortgage?

6    A.    600,000.

7    Q.    What branch of the Citizens Bank, if you
8 know?

9    A.    There's no branch.

10    Q.    You don't know.

11    A.    No.  There is no branch.  I mean it's not
12 that I -- it's just like one office we deal with.
13 It's their main office.

14    Q.    Where is the office you deal with?

15    A.    I don't even know.  I mean it's a number.
16 I don't even know.  If you ask me where it is, I
17 don't know where it is.  But there's not a branch.
18 It seems to be like one nationwide service center
19 that -- I don't think they have any branches, to be
20 honest.  I don't think I've ever seen a branch of
21 Citizen.

22    Q.    When you first took out the mortgage, did
23 you take it from Citizen or from some other bank?

24    A.    Citizen.

25    Q.    I understand from our conversations that

Trustpoint.One   Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Page 18

1  the IRS has a lien on that home; is that correct?
2      A.    Yes.
3      Q.    And how much is that lien for?
4      A.    I think it's like 82,000.  And you also
5  know that my accountant restated my tax -- my
6  financials to the IRS for the last four years, and
7  that should take care of it and actually end up in a
8  refund.  The IRS --
9      Q.    You have a better accountant than I do if
10  you're going to get a refund.
11      A.    You know what?  He feels really -- yeah.
12  Well, he just say he's not sure if the cash will
13  actually follow but he's pretty sure that --
14          (Court reporter clarification.)
15          THE WITNESS:  Basically he feels pretty
16  sure that the change will -- that it will be
17  accepted because it's pretty -- it seems pretty
18  solid.  The only thing that he's not sure, if we
19  actually will receive the refund, but I'm already
20  happy enough if it just takes care of the lien, to
21  be honest.
22  BY MR. MAZZOLA:
23      Q.    Is that lien still in place?
24      A.    I think it is until they did something.
25  We can follow the status online, and they have

Page 19

1  received it and so there is some -- some things are
2  happening in the system.  So I'm not sure -- if it
3  changed, it changed in the last two weeks.  But
4  they, again, this was -- they received this
5  documentation beginning of July.
6      Q.    Are there any other liens on that
7  property?
8      A.    No.
9      Q.    Do you have a checking account, a
10  personal checking account?
11      A.    No, actually.  No.
12      Q.    Does your wife have a checking account?
13      A.    Yes.  That's the only account we use.  I
14  mean I have not wrote a check personal for the last
15  20 years.  My wife is the only one paying all my
16  bills and everything, so I have not been making
17  any -- so there's no reason behind that.  She's just
18  doing all the money parts.
19      Q.    What bank is that checking account with?
20      A.    Wells Fargo.
21      Q.    What branch?
22      A.    Madison.
23      Q.    Madison?
24      A.    Um-hum.
25      Q.    Madison, New Jersey?  Is that a joint

Page 20

1  bank account?
2      A.    Yes.  You know, I would say I'm 85
3  percent sure that it's joint.  It could also be that
4  it's just my wife's.  But I never use it so I mean
5  it's ...
6      Q.    How many accounts are held at Wells
7  Fargo?
8      A.    I have a personal account there, me and
9  my wife or maybe just my wife only.  So that's the
10  one.  The second one is one for LED Capital.  And
11  the third one is the one for IC Technologies.
12      Q.    And they're all at Wells Fargo in
13  Madison, New Jersey?
14      A.    Yeah, they're all the same, the same
15  branch.
16      Q.    Did either you and your wife have any
17  other bank accounts at any other bank?
18      A.    I've told you there are.  There might be
19  two bank accounts that I have opened let's say five
20  to ten years ago.  I have not used these bank
21  accounts at least for the last four or five years at
22  all, and there's definitely no money in it.  So
23  there might be a bank account in Belgium with the
24  KBC.
25      Q.    What branch is that?

Page 21

1      A.    KBC.  I can get you some more -- if I dig
2  into it, I can get you more information, but I can
3  at least say there is no money there and it has not
4  been used since from before I started working with
5  Absen.
6          And then there is one in Hong Kong that I
7  opened, again, not used for five, six years, never
8  really used, and that is with HSBC.
9      Q.    And there's no money in that bank account
10  with HSBC?
11      A.    No.  There has never been any money.  I
12  just opened it to have for big plans but never --
13      Q.    When did you open it?
14      A.    I think 2012, 2013, 2014, that range.
15      Q.    With how much money?
16      A.    What you need to open an account.  I
17  think I had to send $500 for the accountant to deal
18  with it.
19      Q.    That was all the cost you --
20          (Court reporter clarification.)
21          THE WITNESS:  The Hong Kong bank
22  account, it cost me like 500 or a thousand dollars
23  to open it, but also I had a bookkeeper, an
24  accountant, doing it for me.  And then that's it.
25  There's nothing ever -- I don't even know if that

Case 2:22-cv-02158-KM-AME   Document 1-4   Filed 04/13/22   Page 8 of 30 PageID: 22

Page 22

1 money went into the account or to the accountants.
2 I think he put in the account whatever he had to do
3 to make it work. But, again, there's nothing else
4 that I have really done any -- have any assets in or
5 any -- have done any transactions in.
6 BY MR. MAZZOLA:
7    Q.    So the bank in Belgium is called the
8 KB --
9    A.    -- BC. I can get you the exact bank
10 information. I can check if it's still active.
11 Actually I doubt it. But I can see what -- I don't
12 know what they do if somebody has an account that
13 they don't use for five years, do they close it down
14 or do they --
15    Q.    I just want to confirm for the court
16 reporter. It's K as in "kick."
17    A.    Yes.
18    Q.    B as in "boy."
19    A.    Yes.
20    Q.    C as in "car."
21    A.    Yes, Charlie, yeah. And, again, I can
22 get you this information about the HSBC, and I just
23 need to dig a little bit in old e-mails, but I have
24 all of that information and I can provide it to you.
25 Just -- I just mention it because there might be

Page 23

1 these two bank accounts.
2    Q.    What about your children, do you know
3 what banks they bank with?
4    A.    No, but most likely it's all Wells Fargo.
5 It's a friend of mine in Madison, New Jersey. I
6 don't know if they all have bank accounts.
7    Q.    Marcel, what is your brother's name?
8    A.    Rene, R-E-N-E.
9    Q.    Rene?
10    A.    Um-hum.
11    Q.    R-E-N-E. And his name is spelled -- and
12 your brother spells his name with the IJ.
13    A.    Correct.
14    Q.    Where does he live?
15    A.    In Roeselaere, R-O-E-S-E-L-A-E-R-E,
16 Roeselaere, Belgium.
17    Q.    What is his date of birth?
18    A.    July 17, '63.
19    Q.    Is he an American citizen?
20    A.    No, of course not. We are all born --
21    Q.    Is he a green card holder?
22    A.    No.
23         (Court reporter clarification.)
24         THE WITNESS: We were all born in the
25 Netherlands and he never -- he lives in Belgium.

Page 24

1 BY MR. MAZZOLA:
2    Q.    Do you have any other siblings?
3    A.    I have a sister.
4    Q.    What's your sister's name?
5    A.    Ingrid, Ingrid, I-N-G-R-I-D.
6    Q.    And what is her last name?
7    A.    She's married, so it's Leijenhorst,
8 L-E-I-J-E-N-H-O-R-S-T.
9    Q.    Where does Ingrid live?
10    A.    She lives in the Netherlands, and the
11 place where she lives is Putte, P-U-T-T-E.
12    Q.    And what is Ingrid's date of birth?
13    A.    September 12, '68.
14    Q.    Are your parents alive?
15    A.    Yes.
16    Q.    Where do they live?
17    A.    They live also in Putte in the
18 Netherlands, P-U-T-T-E.
19    Q.    What is your father's name?
20    A.    Gerard, G-E-R-A-R-D.
21    Q.    And your mother's name.
22    A.    Is Ada, A-D-A.
23    Q.    Does your wife have any siblings?
24    A.    Yes. I don't know their date of births.
25 I -- do you need all that? I mean --

Page 25

1    Q.    I do.
2    A.    Okay. Julie is one of her sisters. I
3 don't know about middle name and I don't know about
4 her date of birth. It's somewhere -- I can estimate
5 that it's somewhere around in '64. December '64
6 would be my guess. Then there is another sister
7 called --
8    Q.    What's Julie's last name?
9    A.    She got divorced a year ago so I'm not
10 really sure. I think she -- or it's Coll, C-O-L-L.
11 That was her ex-husband. And then her -- if she
12 went back to her maiden name, then it's Zeits,
13 Z-E-I-T-S. And then there is another sister.
14 Debbie. She lives in California, in Redondo Beach.
15 Then there is another sister, Debbie --
16    Q.    Let's talk about Debbie. What is
17 Debbie's last name?
18    A.    Zeits. Never married. Lives in Phoenix,
19 Arizona. I don't know date of birth.
20    Q.    What's that sister's name that lives in
21 Phoenix?
22    A.    That's Debbie. The first one is Julie.
23 Julie lives in Redondo Beach, Julie. So the first
24 one is Julie, lives in Redondo Beach, last name Coll
25 or Zeits, born in '64. The second one is Debbie

Page 26

1   Zeits, lives in Phoenix, Arizona or a suburb -- I'm
2   not sure if it's exactly Phoenix -- never married,
3   so her last name is Zeits.  And there is another --
4   there's a third sister that's called Chrissy.  She
5   lives a little bit north of LA.  I don't know
6   exactly the place.  I know where it is but I don't
7   know exactly the name of it.  It's about a little
8   bit -- an hour north of the Valley.
9       Q.   What's Chrissy's last name?
10      A.   Zeits.  Never married.  Again, I can
11  provide all this.  Whatever you're missing, I can
12  provide you more information.  I mean I'm ...
13      Q.   Are Cynthia's parents alive?
14      A.   Yes.
15      Q.   What are their names?
16      A.   One is Richard Zeits.  He lives in
17  Roswell, Georgia.
18      Q.   And her mother's name?
19      A.   She lives in California, and it's Penny,
20  P-E-N-N-Y.  And her maiden name is -- since they're
21  divorced, her maiden name is Bliss, B-L-I-S-S.
22      Q.   At any time in the last five years have
23  you ever transferred any assets, money, to either
24  your siblings or your parents?
25      A.   No.

Page 27

1       Q.   At any time during the last five years
2   has Cynthia ever transferred any money or assets to
3   either your siblings or your parents?
4       A.   Nope.  I was thinking about her parents.
5   She gives her mother sometimes some money, but I
6   think that's your next question.
7       Q.   The next question is, at any time during
8   the last five years have you transferred any money
9   to Cynthia's siblings or her parents?
10      A.   No.
11      Q.   Now, you said Cynthia sometimes gives
12  money to her parents.  We'll get to that in a
13  second.
14           At any time in the last five years has
15  Cynthia ever transferred any money to her siblings
16  as far as you know?
17      A.   No.
18      Q.   What about her parents?  I think you said
19  yes, she has.
20      A.   A couple of hundred dollars, you know,
21  for a sometime when her mother -- I don't think it's
22  a regular thing.  When she asks me, I will say yes,
23  but it's not like -- I think overall I would be
24  surprised if it's more than $2,000 or something over
25  ever, you understand?  I don't think it's a lot.

Page 28

1       Q.   I recall you saying that Cynthia's father
2   is very wealthy.
3       A.   I don't know that.  I think that, but I
4   have never seen his bank accounts.
5       Q.   I think you put a number $10 million on
6   his name; is that correct?
7       A.   Yeah, that's the story.  I don't know.
8       Q.   As far as you know, how did Mr. Zeits
9   make his wealth?
10      A.   He was a shareholder of a company that in
11  the -- in the military industry that after 9/11 got
12  acquired -- you know, got a fairly big boost in its
13  value, and he sold his shares pretty much fairly
14  short after 9/11.  And then he invested some of that
15  in some gas wells in Texas, and I don't really know
16  for sure I mean if it -- if how that investment
17  actually went.  I think there's a chance that he
18  lost all of it and there's a chance that he made
19  more money, but it's a little bit an urban legend,
20  so I wouldn't be surprised if he doesn't have a lot
21  of this money, but maybe he does.
22      Q.   That's okay.  We've been talking about
23  the house at 64 Rolling Hills Drive.
24      A.   Yeah.
25      Q.   Do you own any other real property?  And

Page 29

1   by real property, I mean homes, buildings, lakes
2   houses, empty lots of land.
3       A.   No.
4       Q.   Does your wife own any real property
5   other than this house in Rolling Hills?
6       A.   No.
7           THE WITNESS:  So I see that somebody
8   else joined then from you on your behalf, Richard?
9           MR. MAZZOLA:  Yeah, that's Rich.  Rich
10  joined.
11          THE WITNESS:  Okay.
12          MR. MAZZOLA:  I don't think you've ever
13  met Rich in person.
14          THE WITNESS:  I recognize the name.
15          MR. MAZZOLA:  That's Richard Lerner,
16  Patty.  He's an attorney that works in our office.
17  He's our law partner.
18  BY MR. MAZZOLA:
19      Q.   Do you have any safety deposit boxes
20  anywhere?
21      A.   No.
22      Q.   Does your wife have any?
23      A.   No.
24      Q.   Do you know if your children do?
25      A.   No.  I mean, as far as I know, nobody has

Page 30

1   a safe deposit box.
2       Q.    You don't have a safety deposit box where
3   you keep important documents, wills or anything like
4   that?
5       A.    No.
6       Q.    Regarding the accounts at Wells Fargo,
7   what is the current balance on deposit?
8       A.    What there is there now?
9       Q.    Yep.
10      A.    I got an update on Friday from my wife.
11  So in the LED Capital account there is $70,000.
12      Q.    Seven zero?
13      A.    Yes.  And in the personal account, it's
14  like in the seven or eight thousand dollar.  And all
15  the children together --
16      Q.    Are you talking to someone?
17      A.    Yeah, I am, to my wife.
18      Q.    Who's that?
19      A.    Can you go on?
20      Q.    Is your wife giving you answers to
21  questions that I ask?
22      A.    Nope.  She just said that that bank
23  account that is personal it's just in her name.
24  It's confirmed what I was a little -- what I was
25  suspicious of.

Page 31

1       Q.    Is your wife listening in on the
2   deposition?
3       A.    Not that I know of but ...
4       Q.    She's permitted to listen in.  She just
5   can't answer questions.
6       A.    I have no problem at all.  It's just
7   distracting me.  So I am not trying to tell a story
8   or something.  I'm not hiding anything so --
9       Q.    Marcel, the problem is, in these
10  depositions, there's sort of a liturgy to them.  If
11  you will.  There's sort of, you know -- we have to,
12  you know, go through certain steps, and sometimes
13  it's a little bit painful for everyone involved.
14          You were going to tell me combined how
15  much money was in the children's accounts?
16      A.    8,000.
17      Q.    8,000.  Are you looking at something on
18  your computer?
19      A.    Yeah, actually like messages coming in.
20      Q.    From who?
21      A.    I don't know.  It went away.  Is it a
22  problem or -- I mean I'm on my laptop.  I have
23  e-mails coming in and I stare at them.
24      Q.    Okay.
25      A.    You have all my attention but I --

Page 32

1       Q.    No, that's okay.  The only reason I
2   ask --
3       A.    I'm not typing or anything.
4       Q.    -- is because if you were looking things
5   up on the computer --
6       A.    Not yet.
7       Q.    -- just let me know you're doing that so
8   Patty can make sure the record reflects that.
9       A.    Yeah.  No, I have not looked up anything
10  right now.  I thought about it when you say on the
11  foreign bank accounts, but I'm not going to get like
12  distracted by that right now.
13      Q.    There's another company, IC Capital; is
14  that correct?
15      A.    Sorry?
16      Q.    IC Capital or IC --
17      A.    IC Technologies.
18      Q.    IC Technologies.  Okay.  Does that
19  company have any bank accounts?
20      A.    The one at Wells Fargo also.  That's the
21  one at Wells Fargo.  I mentioned that before, in
22  Madison, and it has zero money.
23      Q.    Do you have any brokerage accounts?  And
24  by that I mean like, you know, like --
25      A.    I never owned any shares or have ever

Page 33

1   dealt with a broker or purchased any credit shares
2   or any whatever, no.
3       Q.    What about 401(k)s, things like that?
4       A.    Nope, no 401(k).
5       Q.    IRAs?
6       A.    Nope, nothing.
7       Q.    Self-employment pension fund?
8       A.    Nope.  Just my house, J.C.
9       Q.    What about your wife?
10      A.    No.
11      Q.    What kind of work did your wife do?
12      A.    She's a part-time teacher sometimes.  She
13  makes, in general -- the last year she makes $10,000
14  a year, just by when the high schools call for her,
15  if somebody is sick, she jumps in a couple of hours
16  a day like left and right, just to do something.
17      Q.    What is your mortgage?
18      A.    $5,500 a month.
19      Q.    Is that mortgage paid out of your
20  personal account at Wells Fargo?
21      A.    I would say yes, yes.
22      Q.    Do you pay it every month?
23      A.    Normally, yes.  Now with the coronavirus,
24  we applied for a furlough or like -- which I have
25  for another few months.

Page 34

1    Q.    A forbearance on it.
2    A.    Forbearance, that's the word, yes.  And I
3    can extend it another three months if I have to, but
4    that's not done yet.
5    Q.    What about your children's education, did
6    you borrow money to pay that?
7    A.    No.  The children borrowed a little bit
8    themselves, but in general it's a couple of thousand
9    dollars that they have themselves.
10        (Court reporter clarification.)
11        THE WITNESS:  They have some small
12   loans, my children, related to education.
13   BY MR. MAZZOLA:
14   Q.    Did you otherwise pay their education?
15   A.    Not everything, but where necessary I
16   chipped in, yes.
17   Q.    Did someone else pay it?
18   A.    Nope.
19   Q.    Grandparents, a brother, a sibling?
20   A.    No.
21   Q.    Your 19-year-old, is he still in school?
22   A.    Yeah.  He's a freshman.
23   Q.    Where?
24   A.    College of South Carolina.
25   Q.    What's the tuition there?

Page 35

1    A.    Sorry?  Sorry.  College of Charleston.
2    Q.    What is the tuition there?
3    A.    Sorry?
4    Q.    How much is the tuition?
5    A.    I think his -- I mean he gets like a
6    scholarship, and part -- like I think our net cost
7    is maybe like 15,000 a year, something like that.
8    It's not so bad.
9    Q.    Who pays that?
10   A.    Well, if -- I pay it if I can.
11   Q.    Have you paid for the school year
12   starting in September yet?
13   A.    No.
14   Q.    Did you pay --
15   A.    We pay it through the year so usually we
16   pay it like monthly.  That's what we have done, so I
17   don't have to pay the whole amount up front, because
18   I can't.  Yeah, that's what it is.
19   Q.    And the girls have graduated, right?
20   A.    No.  The one has and the other one is a
21   sophomore now.
22   Q.    And she's where, Emilie Ann?  Where does
23   she go to school?
24   A.    Lafayette.
25   Q.    What's that cost?  That's about 80,000 a

Page 36

1    year, isn't it?
2    A.    Like 75, 70.  She has a small scholarship
3    and a loan of -- she has a little help.  So it's
4    under -- it's like 65 or 70.
5    Q.    Okay.  What is the net to you to pay?
6    A.    About that.
7    Q.    70,000 a year?
8    A.    Yeah.  The current -- the starting school
9    year might not really be something that she will do.
10   So it might be finished for now and then start back
11   up in a year from now.
12   Q.    I didn't understand that.
13   A.    It will be online only, so we are not
14   going to pay that kind of money for online-only
15   education.  So I think right now she's done for --
16   until a year from now.
17        For my son, I don't care so much because
18   it's not that expensive and he's young enough.  But
19   for my daughter actually, it's too expensive of an
20   education to accept an online -- an online class.
21   Q.    How do you plan on paying for your
22   daughter's education at Lafayette this September?
23   A.    Monthly.
24   Q.    Okay.  And where do you plan on getting
25   that money from?

Page 37

1    A.    From business that I generate.
2    Q.    Would you borrow that money from any
3    family members?
4    A.    That's not the plan.  But that is -- just
5    so you know, in the arrangement we discussed, you
6    know, the future, whatever you're going to put in a
7    draft, I have other revenue streams that are not
8    captured in that.
9    Q.    What other revenue streams do you have?
10   A.    Well, you know that.  Rental income on,
11   for instance, my floor and sales, equipment sales,
12   the installations that I do with selling equipment.
13   So I have -- with all I have going on already now
14   and nothing related with what -- I mean, again, and
15   the contract is not finished, but I have -- right
16   now I have enough let's say separate cash flow to
17   cover that.
18        So it's not -- it's not that I was
19   planning to use any of the revenue streams that we
20   have in our -- well, again -- what is going to be in
21   the draft of the contract is not affected by this.
22   Q.    Those separate cash flows, are you
23   referring to the ROE inventory?
24   A.    ROE, Lighthouse, the Lighthouse outdoor
25   equipment, and then the selling -- buying and

1  selling of new LED equipment.  So I -- not
2  necessarily Absen LED equipment.
3       Q.    Let's talk a little bit about the ROE
4  equipment.
5       A.    Yes.
6       Q.    What is the expected income stream on the
7  ROE equipment?
8       A.    Impossible to answer right now.  With the
9  Covid virus, it's very difficult to -- impossible
10  really right now to say about my revenues.  Like
11  that's -- I can tell you what it should be.  It
12  should be seven -- in a normal year, it should be
13  like seven, eight hundred thousand dollars a year,
14  $600,000 a year.
15       And it's not my equipment.  I have no
16  title of that equipment.  Equipment is from ROE and
17  I have -- I can use it, I can collect rental income,
18  but I have to pay them an $700,000-ish amount and
19  then I will get title.
20       So I will get title of that equipment if
21  I am paying off the money I owe them.  But I've
22  signed a specific agreement, that this is -- it's
23  very clear that they have title of the equipment
24  and -- but they will give me title if I pay off a
25  certain amount of money.

1       And so I want to be clear.  The
2  Lighthouse equipment I mentioned, that is -- that is
3  my title.  That's from -- I have to kind of see
4  which company it is.  I think it is actually IC
5  Technologies, but I can transfer it out to LED
6  Capital whenever if you want me to.
7       These are my main -- like pretty much my
8  only assets that I have, business-wise.
9       Q.    We'll keep going through all these
10  things.  I asked you earlier about any real property
11  that you or your wife owned, and the answer to that
12  was there is no other real property other than the
13  house in Chatham; is that correct?
14       A.    Correct.
15       Q.    What about valuable automobiles?  Do you
16  and/or your wife own any automobiles?
17       A.    We have a Kia that is on a lease.  It's
18  maybe a two-year-old Kia.  I don't know what the
19  deal is at the end of the lease.  It's a fairly low
20  payment so I assume that we're not really buying
21  into it.  And then I have a GMAC -- a GMC Arcadia,
22  which you have seen, which is maybe worth --
23  whatever it's worth is what is owed on it.  So there
24  is no really asset in it.  I have a Jeep that my
25  daughter is using in Auburn, and that maybe is

1  worth -- maybe that's worth like $5,000, and I fully
2  own that.
3       Q.    Okay.
4       A.    The only vehicle I really own is a Jeep,
5  and I bought it for 10,000 I think five, six -- five
6  years ago, four years ago.
7       Q.    What about any boats or anything like
8  that?
9       A.    No, I have no boats.
10       Q.    Jet skis?
11       A.    No, I have no bike.  I have no jet skis.
12       Q.    No motorcycles?
13       A.    No motorcycles, no airplanes.  I mean I'm
14  not into material things, period, you know, so I
15  have no interest in owning any of that even if you
16  give me $10 million so --
17       Q.    Do you have any expensive, you know,
18  hobbies, expensive bicycles, anything like that?
19       A.    No.  No collection, no cocaine.
20       Q.    What about, do you have any art,
21  expensive art hanging on the walls?
22       A.    No.
23       Q.    Expensive like --
24       A.    Jewelry, no.
25       Q.    Watches?  Do you own a watch?

1       A.    Nope.  An iWatch that my wife has.  But I
2  mean I'm not in -- that's just not who I am.  I'm
3  not into stuff.
4       Q.    Any expensive carpets or anything?
5       A.    Nope.
6       Q.    You sound like --
7       A.    I'll make it more generic then.  I mean,
8  you don't have to ask a list.  There is not anything
9  in my house or that I possess that has any value
10  over a couple of hundred dollars for furniture.  I
11  mean I have maybe a thousand dollar TV.  It's like
12  there is nothing, no -- not one possession that is
13  worth anything.
14       You know, I did mention some things that
15  are owned by companies, so that the main asset is
16  the Lighthouse equipment.  I mean that is eight
17  years old but it has some -- can still generate some
18  cash flow.
19       Q.    The Lighthouse equipment is owned by the
20  company?
21       A.    Yes.  I acquired that from the U.S. Open,
22  USTA.
23       Q.    And is that owned by LED Capital?
24       A.    I think -- I'm almost hundred percent
25  sure, because of my deal, that it's IC Technologies.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Page 42

1  But I can transfer that to LED Capital as soon as
2  you want me to do that.  I don't -- it doesn't
3  matter to me.
4      Q.   What is the value of the Lighthouse
5  equipment?
6      A.   I bought it from the USTA for like
7  $300,000, but that was part of an overall deal, you
8  know, where they bought from me.  You know, it's the
9  deal I talked about.  So I probably paid a little
10  bit too much for it to get the overall deal to make
11  the other -- the overall deal happen.  But, you
12  know, if you don't do a fire sale, you go look for
13  the right buyer or the right user in the rental
14  market, it can definitely generate that kind of
15  money in the next two years, three years, you
16  know --
17          MR. MAZZOLA:  So the record is clear
18  he's saying USTA, U.S. Tennis Authority, Tennis
19  Association.
20  BY MR. MAZZOLA:
21      Q.   Do you have any -- are you an officer or
22  shareholder in any corporation other than LED
23  Capital or IC Technologies?
24      A.   And then there is this company in Atlanta
25  that I started, you know, to do the rental business

Page 43

1  in.  It's not being used but it exists.  I have not
2  opened a bank account yet.  Maybe I should have
3  mentioned that.  Oh, you knew about it, but I want
4  to mention it.  That's IC-LED, LLC.
5      Q.   IC --
6      A.   -- dash LED, LLC.  That's a Georgia
7  company.  Again, we only started it maybe six months
8  ago, and it doesn't have a bank account, so we
9  didn't use it yet, but the intention is to do all
10  the equipment rental in Georgia.  We needed to have
11  a Georgia company for that.  Again, so far --
12  actually it's a little older than six months I
13  realize.  It's probably more like eight or nine
14  months old.
15      Q.   LED Capital is a New Jersey company?
16      A.   It's Delaware or New Jersey, and I think
17  IC Technologies is New Jersey.
18      Q.   Are there any other companies, Marcel?
19  LED Capital, IC Technologies, and IC-LED, LLC.
20  Anything else?
21      A.   These are the only ones that we file --
22  my accountant files taxes on and everything.
23  There's some companies, I don't know exactly the
24  status.  We started -- we run like a few years ago,
25  five, maybe eight years ago I think I started, and I

Page 44

1  have never really used these companies -- the
2  accountant has never used these companies because
3  what we wanted to do, you know, obviously, it
4  didn't -- a lot of things didn't go to plan.
5          So there might exist some existing
6  companies but nothing that I have assets or bank
7  accounts or that I file taxes on.  So there is --
8  you want to dive into that, I'll support it, but I
9  want to mention that I only have one accountant, so
10  we can -- I can ask him what still exists.  Again, I
11  don't know what happens with companies that are
12  inactive and not used.
13      Q.   Can you give me the names of those
14  companies and where they're incorporated?
15      A.   I think they're -- they are all Delaware
16  because that's what we did.  I know one -- I think
17  it's the only one actually, and that's what's called
18  IC Lighting -- there are two actually.  IC Lighting,
19  LLC and the LED Group, LLC.  But, again, there's no
20  transactions.  I don't report it in my taxes.  There
21  is -- if it exists, it's just a shell.
22      Q.   Do they have bank accounts?
23      A.   No.  And I'm almost a hundred percent
24  sure they never have.  And if they do, there is no
25  money or I have not paid any money in or out of

Page 45

1  these bank accounts for at least eight years.  Well,
2  six, seven years.
3      Q.   I asked you about stocks and investments.
4  Do you own any bonds, corporate --
5      A.   No.
6      Q.   -- U.S., anything like that?
7      A.   No.
8      Q.   Does your wife?
9      A.   No.
10      Q.   Do you have any interest in any
11  partnerships?
12      A.   No.
13      Q.   What about interest in real property?
14  Now, I asked you if you and your wife owned
15  anything, but maybe you have a proportional share in
16  someone's lake house someplace.
17      A.   No.  I would have mentioned it.
18      Q.   Have you ever lent money to anyone?  By
19  that I mean large amounts, say over $5,000?
20      A.   No.
21      Q.   Have you ever lent anyone money to buy a
22  house or a car or start a business?
23      A.   No.
24      Q.   Do you know what it means to be a
25  beneficiary in a trust?

1   A.   I'm not.
2   Q.   Okay.  You're not.  You know what I mean
3   by that, right?
4   A.   I -- if you asked me the legal
5   explanation of that term, then I would say I don't
6   really know exactly what it means, but I assume it's
7   like a certain amount of money that is sitting
8   somewhere that is paid out over time to the
9   beneficiaries, correct?
10   Q.   Okay.  So there's nothing like that going
11   on with you, right?
12   A.   No.
13   Q.   No?
14   A.   No, nothing.
15   Q.   What about your wife?
16   A.   Nothing.
17   Q.   What about your children?
18   A.   Nothing.
19   Q.   So your brother doesn't have a trust and
20   he pays your children's tuition or anything like
21   that.  No?
22   A.   No.
23   Q.   And your father-in-law doesn't have a
24   trust and perhaps he helps out his daughter?
25   A.   No.  I mean he was asked to cosign on our

1   lease, and he didn't want to do that, so no more
2   financing for this year so --
3   Q.   Cosign on what lease?
4   A.   In case the Lafayette school year would
5   happen, you know, we would prefer that my daughter
6   would be able to borrow the money for it, but he
7   refused -- he said he would do it and then he bailed
8   out so ...
9   Q.   So you asked your father-in-law to cosign
10   sign your daughter's apartment at Lafayette and he
11   wouldn't do it?
12   A.   Her tuition.
13   Q.   Her tuition.  And he would not do it.
14   A.   I didn't ask him.
15   Q.   Who asked him?
16   A.   I did not ask but my wife did.
17   Q.   And he said no?
18   A.   He said yes, and then he bailed out
19   because his wife gave him shit for it.
20   Q.   Are there any liens or judgments against
21   your wife?
22   A.   No.
23   Q.   Are you a named beneficiary in anyone's
24   will, if you're aware?
25   A.   My parents don't really have -- I mean I

1   assume I'm in my parents' will, but it's not even
2   worth -- there's probably like nothing there.  You
3   know, whatever, they will continue to live and from
4   whatever they have and pensions, but it's not
5   really -- I don't count on inheriting anything from
6   them.
7   Q.   What about your brother?  Are you a named
8   beneficiary in your brother's will?
9   A.   I'm not aware of that, no.  We've never
10   talked about it.  I mean I assume not.  I mean I ...
11   Q.   Does your brother have a family?
12   A.   Yes, two children and a wife.  Plus she's
13   a lot younger than -- so she's going to have to live
14   for -- she's going to have to be supported for a long
15   time.
16   Q.   Is your wife a named beneficiary in a
17   will as far as you or she knows?
18   A.   I think she is in her dad's will because
19   he has like something, but that's -- the only reason
20   I think that is that one time he called for like her
21   Social Security number and her information.
22   Q.   How old is your father-in-law?
23   A.   Seventy-five.
24   Q.   Is he healthy?
25   A.   Yeah.

1   Q.   Excuse me?
2   A.   Yes, yes.  Again, he has a young family,
3   too.  He has a young wife and a ...
4   Q.   Your father-in-law has a second wife and
5   family?
6   A.   Yeah, yeah.  She's young, and a whole
7   bunch of children.
8   Q.   Do you have any life insurance policies?
9   A.   Yes.  I have one life insurance policy
10   for a million dollars.
11   Q.   Is that a term life or whole life, if you
12   know the difference?
13   A.   It's not an asset.  It's just something
14   I'm paying, but if I stop paying -- it's not an
15   asset.  It's only something I pay monthly.  It's
16   something I have for ten years.  I think I have to
17   renew it in two years from now or something.
18   Q.   Do you have any other insurances other
19   than like homeowners insurance or --
20   A.   No.
21   Q.   -- car insurance?
22   A.   No.  The business the equipment, the
23   Absen equipment that we talked about, just
24   regular --
25        (Court reporter clarification.)

Trustpoint.One    Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Page 50

1   THE WITNESS:  I have equipment when it's
2   in the warehouse, and we probably have to look if
3   I -- if the value of the equipment is accurate.  You
4   know, we probably have to re-look at that in this
5   new agreement, but it will be part of the new
6   agreement.
7   Correct, John?  I mean I assume that
8   you're going to have a look at the --
9   BY MR. MAZZOLA:
10   Q.   Since you brought it up, do you have
11   insurance on the warehouse in Kennesaw, Georgia?
12   A.   Yes.
13   Q.   What insurance company?
14   A.   I don't know.
15   Q.   Who is the broker?
16   A.   I don't know.
17   Q.   How did you --
18   A.   I really don't know.  I mean my wife is
19   booking that.  I really don't know.  But I can get
20   it to you.  I'm not like not willing to provide it
21   or something.  And, by the way, I mean I have no --
22   no obligation in any contracts to have insurance
23   right now, correct?
24   Q.   I'm just asking you.
25   A.   No.  I'm just telling you.  I mean you

Page 51

1   make it look like I have some kind of obligation to
2   have like a certain amount --
3   Q.   Marcel, this is really -- the thing about
4   these types of examinations depositions is I ask the
5   questions and you answer them.  It goes a lot longer
6   that way -- faster that way.
7   Is the rent on the warehouse in Kennesaw,
8   Georgia, is that paid up and up to date?
9   A.   It's in good coordination with the
10   landlords.  We going to pay -- the balance of June
11   is going to be paid in the next days, and then I
12   will probably pay half of July in another week,
13   before the end of July.
14   So I pay late by half a month, let's say.
15   I'm just dragging little bit.  But they are cool.
16   They are very good.  I have three months deposit on
17   the space, so if everything I have cooking now is
18   happening, I mean then I definitely will be able to
19   stay more current, but I have no problems there.
20   Let's say it that way.
21   Q.   How much is the rent on the warehouse?
22   A.   $11,000 a month.
23   Q.   Have you ever loaned any money to anyone?
24   I think I asked you that question.
25   A.   No.

Page 52

1   Q.   Does anybody owe you any money, gambling
2   debts or anything like that?
3   A.   Somebody owes me a gambling debt or I owe
4   somebody a gambling debt?
5   Q.   No.  Does anyone owe you?
6   A.   No.
7   Q.   You know, perhaps you were playing the
8   Super Bowl squares and you won $50,000 in one of
9   those games.  Nothing like that?
10   A.   No.  I mean I have -- you know I have
11   receivables in the business like.  You know, one of
12   the biggest one is PIG.  It's maybe 150,000.  I have
13   like some receivables in the business.  I am not
14   sure of -- it's all people in the same event
15   industry.  So I am not sure how fast I will see that
16   money, but there is some receivables in the company,
17   but there are also some bills in the company, yeah,
18   so it's like --
19   Q.   Okay, Marcel, since you brought it up --
20   A.   Why do you say that like "since you
21   brought it up?"  Does it means like is there certain
22   things -- let me ask you, because you did this now
23   for the second time in a row.
24   So does it mean that there are certain
25   things you're not really allowed to ask but only

Page 53

1   when I bring it up you're allowed to go into it
2   or --
3   Q.   No.  I can ask pretty much anything
4   within the scope of discovery in connection with an
5   asset deposition.  I can't give you legal advice,
6   but since there is a judgment against the company,
7   I'm entitled to know the company's assets and
8   liabilities, and a receivable is an asset.  The
9   reason I say it that way is because I wasn't going
10   to ask that question.
11   A.   Yeah.  See, I'm here not to hide anything
12   from you.  I mean I'm just here to share.
13   Q.   Since you were served with the lawsuit
14   back in 2019, have you closed any bank accounts?
15   A.   No.
16   Q.   Have you closed any brokerage accounts?
17   A.   No.
18   Q.   Have you sold any property?
19   A.   No.
20   Q.   Have you transferred any assets since
21   June of 2019?
22   A.   No.
23   Q.   Has your wife sold any assets?
24   A.   No.
25   Q.   Has she transferred any property to

Page 54

1  anyone?
2      A.    No.
3      Q.    Has she sold any property?
4      A.    No.
5      Q.    So if I went back to June of 2019, from
6  then and forward --
7      A.    You can go back to '15.
8      Q.    -- there's been no asset transfers, no
9  sales of any property?
10     A.    Nothing.  The only substantial payments
11  that I have been making is as the company, and it's
12  to Absen and to ROE.  These are the two companies
13  that is pretty much the most -- or all the money
14  that went out, and everything else is salaries and
15  company bills.
16          MR. MAZZOLA:  Marcel, it's 12:11.  Can
17  we take a two-minute break?
18          THE WITNESS:  Yes.
19          (A recess was taken from 12:11 p.m.
20  until 12:18 p.m.)
21          (Brief recess.)
22  BY MR. MAZZOLA:
23     Q.    What was your -- if I say adjusted gross
24  income, do you know what I mean by that?
25     A.    No.

Page 55

1      Q.    How about this.  On your tax return for
2  2019 -- did you file it yet?
3      A.    Yes, of course.  I always file my taxes.
4      Q.    Do you file them jointly with your wife?
5  Okay.  You have food in your mouth.  We'll wait.
6      A.    Sorry about it.  Yes.
7      Q.    What was your combined gross income on
8  that 2019 tax return?  The one that was just filed
9  on July 15.  You don't know?
10     A.    I think on the -- the one on July 15 was
11  really -- that was not the taxes for 2019 I believe,
12  correct?  I think we filed that earlier.
13     Q.    Yeah.  That was the taxes for 2018.  So
14  I'm trying to understand what your tax return that
15  you filed -- the one you filed in July 2020, right,
16  just a week ago, that would have been -- if you
17  filed on time, that would have been your reflection
18  of your income for tax year 2019.
19     A.    Okay.  I don't know, but I can find out.
20     Q.    Can you find out -- we're going to leave
21  a blank in the transcript, okay?  We want your total
22  income --
23     A.    I don't have to pay -- I don't pay any --
24  really a lot of taxes or usually we got a refund
25  because the companies are not really -- you know,

Page 56

1  they're all LLCs, so, yeah.  I have to get for you.
2      Q.    All I want to know is how much money did
3  you and your wife make on your tax return for 2019.
4      A.    Okay.
5      Q.    We'll leave a blank.
6          Do you know what it was for 2018?  That
7  would have been the tax return -- we'll leave a
8  blank.
9      A.    I don't know.
10     Q.    So you understand, Marcel, we're going to
11  leave a blank and then you're going to have to give
12  me that information later.
13          Same thing for 2017.  Do you know?
14     A.    No.
15     Q.    And 2016, do you know?
16     A.    No, I don't know.
17     Q.    And I'm going to assume the same is for
18  '15 and '14.
19     A.    That's right.
20     Q.    So we're going to leave a blank in the
21  transcript for you to find out what the income on
22  your personal tax returns were for the years '19,
23  '18, '17, '16, '15 and '14; is that fair?
24     A.    Okay.
25     Q.    And you'll provide that information to

Page 57

1  us.
2      A.    Of course.
3      Q.    Don't cover your mouth when you speak
4  because sometimes the court reporter likes to look
5  at your face.
6      A.    Of course.
7      Q.    I want to talk about the businesses.
8          As I understand there's LED Capital; is
9  that correct?
10     A.    Correct.
11     Q.    There's IC Technologies; is that correct?
12     A.    Correct.
13     Q.    ICD LED, LLC; is that correct?
14     A.    Correct.
15     Q.    And there's IC-Lighting, LLC; is that
16  correct?
17     A.    I don't know for sure.  I mentioned that,
18  but -- that might be still existing, but it's not
19  used or it's not filed for tax purposes and
20  everything, so it's inactive let's say.
21     Q.    And there's LED Group, LLC, right?
22     A.    Again, I'm not sure of the status of
23  that.  It's inactive.  Probably never used, both of
24  these last ones, so --
25     Q.    I'm going to focus the discussion for the

Page 58

1  moment on LED Capital --
2      A.   Yes.
3      Q.   -- and IC-Technologies and IC-LED, okay?
4      A.   Yeah.  The last one there is nothing
5  there.  It is never used.  So that's just going to
6  be used for the rental.
7      Q.   Excuse me?
8      A.   The last company, nothing has ever
9  happened in it.  It just started.  There's no bank
10 accounts.  There's no transactions then that
11 happened in -- in that company.  So you can ask me
12 questions about it.  It's just I don't know --
13 there's nothing really --
14         Actually let me change that a little bit.
15 The landlord -- the contract in Atlanta on the
16 building is on IC-LED, and then it's guaranteed or
17 cosigned by IC Technologies.  That's I think how --
18 so if any transaction or anything ever happened, the
19 only thing that ever happened by IC-LED is the
20 signing on the lease there.
21     Q.   Who is the landlord?
22     A.   Prologic.
23     Q.   What?
24     A.   Prologic.  P-R-O-L-O-G-I-S at the end, so
25 it's really Prologis.

Page 59

1      Q.   And what is the landlord's address?  If
2  you need to look it up, you can do that.
3      A.   I'm doing it on my phone so -- so
4  Prologis is the name, so P-R-O-L-O-G-I-S.
5      Q.   And what is their address?
6      A.   They're everywhere.  I don't really know
7  exactly their -- it's like a nationwide company, so
8  if you ask me ...
9      Q.   We can find it.
10         Your rent on the location in Georgia is
11 $11,000; is that correct?
12     A.   Correct.
13     Q.   Do you have any other rental properties
14 in Georgia?
15     A.   No.
16     Q.   No?
17     A.   No.
18     Q.   Do you personally have any rental
19 properties in Georgia?
20     A.   No.
21     Q.   Where do you stay when you visit Georgia?
22     A.   I sleep most of the time in the office
23 there, and if I'm not, I stay in the extended stay.
24 But I am looking -- you know, I am looking for,
25 especially when -- you know, if we resolve this

Page 60

1  situation, I am looking to relocate, to rent a house
2  or -- over there.  So it's definitely something I am
3  going to do but I have not done yet.
4      Q.   About how many days of the year do you
5  spend in Georgia?
6      A.   Again, the Covid virus has -- there is no
7  rental activity in our business right now for the
8  last four months.  So I definitely spent less time
9  in Georgia now than what I would have if we didn't
10 have -- you know, if there was still normal -- a
11 normal business.
12         But it's my intentions to be in Georgia
13 pretty much full-time, live there, be there at least
14 Monday to Friday.  Depends when I sell my house, of
15 course, you know.  So until I have a house here,
16 I'll probably travel here on the weekends at least,
17 but if the business is limited, yeah, you know.
18     Q.   In 2019, how many days out of the year
19 did you spend in Georgia?
20     A.   Almost nothing, because we only moved
21 there I think in October, October or November.  So I
22 would say in all of 2019, only a few days.  Before
23 that, we were in Nashville.  That's where we set up
24 shop first.
25     Q.   Okay.

Page 61

1      A.   And then we located to Kennesaw, to
2  Atlanta.  It's actually working much better.
3      Q.   When did you set the business up?
4      A.   Sorry?
5      Q.   When did you set this business up?
6      A.   When we started the contract with Absen.
7      Q.   When did you do that?
8      A.   I was taking delivery I think it was
9  mainly the end of -- around the start of 2018 pretty
10 much, January 2018.  I think some equipment came a
11 little earlier.  Some equipment came a little later.
12 The outdoor equipment was more February/March, 2018.
13 The 2.9 and the XPV --
14         (Court reporter clarification.)
15         THE WITNESS:  The start of the business
16 was January 2018 when the equipment start getting
17 delivered.
18 BY MR. MAZZOLA:
19     Q.   When you started the business in January
20 2018, the warehouse was in Nashville; is that
21 correct?
22     A.   No.  At that moment I had no warehouse.
23     Q.   Okay.  Where was the --
24     A.   I had a temporary warehouse in East
25 Hanover that I used for a little bit, and then we --

Page 62

1  I started a partnership with a company in Nashville
2  where I was -- where we were started to store
3  equipment, and then I think we were -- we were
4  operating out of Nashville for -- pretty much from
5  the spring of 2018 till we moved to Atlanta, till
6  the end of 2019.  So it was a little bit more than
7  17 months, 18 months.
8      Q.    During that 17, 18-month period ending in
9  December 2019, how many days out of the year did you
10  spend in New Jersey?
11     A.    That's so difficult.  I was in Nashville
12  a lot, a lot.
13     Q.    Did you spend more than half of that time
14  in Nashville or --
15     A.    I'm pretty sure that I was there more
16  than half the time, because we were -- just like I
17  would be more than half the time in Atlanta, you
18  know, during normal operations of the business, I
19  would say more than half, but I really have to just
20  look at my calendar and go over it.  I mean I guess
21  it matters or else you wouldn't ask but --
22     Q.    Can you look at your calendar and tell
23  us?  We'll leave a blank here.
24     A.    That would be -- it would be a real -- I
25  mean it's not that I put in my calendar where I was

Page 63

1  at that time so I have to --
2      Q.    Can you give me an estimate?  How about
3  that.  So for 2019.
4      A.    Let's say about half, I would say.  I
5  don't think -- does it matter for like my taxes if
6  I'm there like --
7      Q.    Marcel, I don't really care about your
8  taxes.  Let me finish.  It's between you, the IRS,
9  and your accountant.
10     A.    Right, right.  I have filed my taxes like
11  I -- just in New Jersey.  I have not really changed
12  anything to -- related it to -- because I was in
13  Nashville let's say a lot of days.  I filed taxes
14  like I was in New Jersey every day.
15     Q.    Okay.
16     A.    I think.
17     Q.    Let's go back to this warehouse.  You had
18  a warehouse in New Jersey; is that correct?
19     A.    For a few months, yes.
20     Q.    The warehouse in Georgia didn't -- you
21  didn't start that until December or January of this
22  year, right?
23     A.    November of last year, yes.
24     Q.    November of 2019.  Okay.
25     A.    Yeah.  But then we had to move -- we

Page 64

1  moved the equipment, you know, and some time went
2  by.
3      Q.    Where is the warehouse in -- where was
4  the warehouse in Nashville located?
5      A.    It was two warehouses.  We moved one time
6  in Nashville from -- it was -- for the first three
7  months it was on Zilow Street, Z-I-L-O-W.  And then
8  after that, we moved into the -- we shared a part of
9  the building of a large lighting company called
10  4Wall, and that's where we were there for more than
11  a year.  So the main -- the main was in -- I don't
12  have the address.  And, John, are you there?
13         (Court reporter clarification.)
14     Q.    I'm here.
15     A.    I mean Absen has been visiting us in
16  the -- John has been visiting me in all these
17  warehouses and everything, so this is all --
18     Q.    That's okay.  It's okay.  We have to get
19  it down in the transcript.
20         Is there any inventory in the warehouse,
21  any warehouse in Nashville?
22     A.    No.
23     Q.    What about East Rutherford, anything
24  there?
25     A.    Nope.

Page 65

1      Q.    There's another warehouse in Congers,
2  right?
3      A.    There's a warehouse in Congers that I
4  use.
5      Q.    Is there anything in that warehouse?
6      A.    Yes.
7      Q.    Do you have an inventory of what is in
8  that warehouse?
9      A.    Everything I have is the same what we
10  made with Absen together.  So John has that
11  information.  It's a spreadsheet.
12     Q.    What is the address of the warehouse in
13  Congers?
14     A.    Sorry?
15     Q.    What is the address of the warehouse in
16  Congers, New York?  Are you looking it up, Marcel?
17     A.    Yeah, I am.  I should know by now.  100
18  Wells Avenue, Congers, New, York, 10290.
19     Q.    What avenue?
20     A.    Wells, W-E-L-L-S.  100 Wells Avenue,
21  Congers, New York.
22     Q.    So now we've talked about warehouses.
23  There's a warehouse in Kennesaw, Georgia.  Prologis,
24  right?
25     A.    Um-hum.

Page 66

1   Q.   There were warehouses in Nashville,
2   right?
3   A.   Not rented by me but that I was able to
4   use, yes.
5   Q.   Okay.  And there's a warehouse in
6   Congers, New York, right?
7   A.   Again, not rented by me.  It's a
8   warehouse from somebody else, but I can put
9   equipment there.
10   Q.   Do you pay rent for that?
11   A.   I'm not paying rent on the place in
12   Congers.
13   Q.   Why not?  They let you use the space for
14   free?
15   A.   No.  Like a -- it's a -- I explained this
16   to you last week.  So it's a customer who also rents
17   equipment from me.  They have too much storage
18   warehouse space, so I pretty much allow him -- or he
19   allows me to use the warehouse, and he's charging me
20   let's say $5,000 a month, but then I give him that
21   amount credit in the use of the equipment, you
22   understand?
23   Q.   So the rent is 5,000 a month.
24   A.   Yeah, but I'm not paying him -- yes,
25   basically, you're right, I'm paying him 5,000 a

Page 67

1   month.
2   Q.   What's the name of that guy, that
3   company?
4   A.   Ed Damico.
5   Q.   What is it?
6   A.   Ed.
7   Q.   Ed?
8   A.   Yeah, Damico, D-A-M-I-C-O.
9   Q.   D-A-M-I-C-O.  Ed Damico.
10   A.   Yeah.
11   Q.   That's a guy, not a company.
12   A.   A guy.
13   Q.   And where does Mr. Damico live?
14   A.   It's a little bit north of Morristown,
15   New Jersey.  I don't know his personal address.  I
16   mean I can drive to it.  I know where it is.  I've
17   been there.
18   Q.   To his house?
19   A.   What?
20   Q.   To his house?
21   A.   Yes, of course, yeah, because we both
22   live more on this side of -- we both -- we live
23   closer together than to the warehouse.
24   Q.   What's his phone number?
25   A.   (201)280-2880.

Page 68

1   Q.   201 --
2   A.   -- 280 --
3   Q.   -- 2880.
4      So now what I want to make sure is that
5   that there is no inventory owned by any of your
6   companies anywhere else other than in Kennesaw, New
7   Jersey, and Wells Avenue in Congers.  Is that
8   correct?
9   A.   Correct.  And the equipment from Wells
10   Avenue is scheduled to move to Kennesaw like we have
11   agreed, like we discussed.  So I have -- I have a
12   trip there tomorrow in Congers, and it's picking up
13   equipment from me of equipment from Absen and going
14   to bring it to Kennesaw.
15      So I -- you have to see a little bit how
16   much fits in this equipment, but it could very well
17   be that starting tomorrow -- I mean if you want to
18   come, you can come -- we moving -- there's no
19   equipment from me anymore there.
20   Q.   And when will it arrive from in Kennesaw,
21   Georgia.
22   A.   Two days later or a day later.
23   Q.   On Thursday?
24   A.   Yeah.
25   Q.   Will you be down there to meet the truck?

Page 69

1   A.   I think actually I will be, yeah.  But
2   again we -- you know about this, I mean that we were
3   moving everything to Kennesaw pretty much.
4   Q.   And there's nothing in Nashville, nothing
5   anywhere else, right?
6   A.   There's nothing anywhere else.
7   Q.   Okay.  Who are the -- who is the -- are
8   there any other owners of LED Capital other than
9   you?
10   A.   No.  I'm the only officer, only person.
11   Q.   Your wife is not one?
12   A.   No.  Do you want me to ask her?  No.
13   Q.   What's that?
14   A.   I'm just -- silly joke.
15   Q.   What about ICD -- IC-LED Tech?  Is it
16   just you?
17   A.   Yeah.  Everything is just me.  There's
18   nobody else.
19   Q.   Let's talk about the way you run the
20   business.
21      Do you run the businesses separately or
22   are they run together with two bank accounts, same
23   checking accounts?  How do you do that?
24   A.   I mean we try to do it as separate as
25   possible.  That means IC Technologies is really just

Page 70

1  a company that does sales, sales, and LED Capital is
2  a rental -- is a rental business. And, in general,
3  we try to do everything right, because actually I
4  have the right insurance on the right company for
5  the rental business. I don't have the right
6  insurance on IC Technologies. So, in general, we're
7  trying to keep it completely separate.
8         Now, since they're all one and at the
9  same, my companies is not necessarily -- it's not
10 like I want to say that nothing ever got booked the
11 wrong way, but it's not that I'm really having --
12 building up assets for any one company over the
13 other. I'm just trying to pay my bills as much as
14 possible and -- yeah.
15 Q.    LED Capital, that's the party that
16 contracted with Absen to purchase these LED panels,
17 correct?
18 A.    Correct, yes.
19 Q.    So how is it that IC Technologies uses
20 those panels and sells them?
21 A.    It doesn't.
22 Q.    It doesn't. What do they do then? What
23 does IC Tech do?
24 A.    IC Technologies just buys and sells new
25 equipment for installation -- let's say it's -- that

Page 71

1  I'm doing that in that company. The last years I'm
2  not doing so much business in there, but basically
3  we buy new screens from -- we find customers that
4  want to buy LED screens, like retail stores, and
5  then we go -- we go buy it in China. So it has
6  nothing to do -- there's no inventory. There are
7  different suppliers, different Chinese
8  manufacturers, but we just buy and sell. That's it.
9  Q.    Does IC Technologies have any purchase
10 orders for any inventory for any customer in the
11 U.S.?
12 A.    Right now, yes. Again, I talked to you
13 about it but there is --
14 Q.    You have to tell me now, Marcel, because
15 now --
16 A.    Yeah, I know. Yes, we have one sale of
17 equipment in California. It's a swimming pool in
18 Montecito, California, that IC Technologies is
19 selling.
20 Q.    Okay. You have a purchase order for
21 that.
22 A.    Yes, of course.
23 Q.    And how much is the purchase order for?
24 A.    $120,000.
25 Q.    And that is for existing inventory or new

Page 72

1  inventory?
2  A.    That's for new equipment that still has
3  to be manufactured in China.
4  Q.    Who is manufacturing it for you?
5  A.    It's a company called Rocketsign.
6  Q.    Spell that for me. Spell it.
7  A.    Rocket. A rocket.
8  Q.    Like zoom in the sky?
9  A.    Rocketsign, so R-O-C-K-E-T-S-I-G-N, K-N.
10 Q.    And Rocketsign is a Chinese manufacturer?
11 A.    Yeah. They're like a much smaller niche
12 manufacturer, much smaller than Absen.
13 Q.    In what city?
14 A.    Sorry?
15 Q.    Are they in Shenzhen?
16 A.    Most likely, yes.
17 Q.    Have you been paid on that purchase
18 order?
19 A.    Yep.
20 Q.    You have been?
21 A.    Yes.
22 Q.    When were you paid?
23 A.    The money that I have right now is from
24 that.
25 Q.    Have you paid the manufacturer in China?

Page 73

1  A.    The deposit, yeah, but I'm getting
2  another payment from a customer.
3  Q.    What was the deposit you paid to the
4  factory in China?
5  A.    40,000, 30,000, something like that.
6  John, you want to go over every deal and every
7  rental deal that I have going on right now? I mean
8  I'm fine. I just don't really understand why this
9  is so important.
10 Q.    We're not going to go over every one. I
11 was just asking about IC Technologies.
12 A.    It's not like the money that I am making
13 is all to pay bills and the warehouse rent. I don't
14 really consider that different money or something.
15 Q.    Okay, Marcel, let's just answer the
16 questions.
17         Who is this buyer in California? What's
18 his name?
19 A.    I don't know what company exactly the
20 payment came from, if it came from an RC technical
21 firm, but the real buyer is the owner of the Four
22 Seasons Hotel over there.
23 Q.    What's his name?
24 A.    Ty Warner, T-Y  W-A-R-N-E-R.
25 Q.    W-A-R-N-E-R. Warner. Ty Warner.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Page 74

1    A.    Yeah.  He's a billionaire, and he owns
2    the Four Seasons in New York.  He owns the building.
3    He is the landlord to the Four Seasons, for the Four
4    Seasons in New York, the Four Seasons in Montecito,
5    and he owns like three more Four Seasons and some
6    golf clubs and whatever.
7    Q.    Okay.  So that $120,000 has been paid to
8    IC Tech.
9    A.    No.  The deposit has been paid.
10   Q.    The deposit was paid.  So what is the
11   receivable then?
12   A.    $40,000.
13   Q.    So you're owed $40,000 from Ty Warner?
14   A.    That is the balance, yep.
15   Q.    Okay.  So he paid a deposit of 30 or 40
16   and he owes you another 40?
17   A.    Correct.
18   Q.    How does that add up to 120?
19   A.    No.  I paid the Chinese manufacturer a
20   $30,000 deposit.
21   Q.    Okay.  So Ty owes -- he owes you 90 then,
22   right?
23   A.    I told you I got an $80,000 deposit from
24   him.
25   Q.    Okay.  You didn't tell me that.  Now I

Page 75

1    know.  You got an $80,000 deposit from Ty.
2    A.    Right.  So he still owes me 40, correct?
3    Q.    Then you gave 30 to the Chinese, right?
4    A.    Correct.
5    Q.    Okay.
6    A.    I have more expenses on the project than
7    the LED screen.  I have to install it.  I have to
8    buy more equipment for it.  So it's not that the
9    Chinese equipment is my only expense.
10   Q.    Okay.  So the receivable is $40,000.
11   A.    Yes.
12   Q.    Does IC Tech have any other receivables?
13   A.    No.
14   Q.    Does IC Tech have any other purchase
15   orders that have been issued within the last six
16   months that have to get filled?
17   A.    No.  This is the only business.
18   Q.    Okay.  Does IC Tech have its own bank
19   account?
20   A.    We went over that, yes.
21   Q.    How much money is in IC Tech's bank
22   account?
23   A.    I'm mentioned that already.  It's zero.
24   Q.    Zero.  Okay.
25   A.    I mean zero, there's no money there.  I

Page 76

1    don't know if it's zero, but it's less than a
2    thousand or something.  We keep all our money in LED
3    Capital pretty much.
4    Q.    Who handles the bookkeeping for IC Tech?
5    A.    My wife does the bookkeeping, and then
6    she is checked by an accountant, accounting office,
7    who makes sure she does everything right and who
8    files the taxes.
9    Q.    That's the accountant, right?
10   A.    Yes.
11   Q.    Who is the accountant?  What is that
12   person's name?
13   A.    Michael Mazzuco.
14   Q.    Michael?
15   A.    Yeah, Mazzuco.
16   Q.    M-A-Z-Z-U-C-O?
17   A.    Yes.  And he is -- I mean I am dealing
18   with him for -- since 2012 and he's running the --
19   the -- what's the name of that tax file company?
20   What's that company name that does -- files all the
21   taxes for people?
22   Q.    I don't know.
23   A.    H & R Block or something?
24   Q.    Oh, he's an H & R Block guy?
25   A.    Yeah, he's an H & R Block, Chatham.  He

Page 77

1    runs the Chatham office for H & R Block, yes.  He
2    did that after I start working with him, so I'm not
3    sure how much I am part of this H & R Block deal.
4    Q.    The other company, that's LED Capital,
5    right?
6    A.    Correct.
7    Q.    You did say that you operate them as one;
8    is that correct?
9    A.    No.
10   Q.    No what?
11   A.    I try to keep it completely separate, the
12   two activities, sale and the rental, but it just
13   means -- my wife does the bookkeeping.  There's, you
14   know ...
15   Q.    Are the assets --
16   A.    They're really two companies.  There are
17   no assets in IC Technologies, so we don't share
18   assets.  When I do a sale business, then it is
19   IC Technologies, selling of new equipment.  And so
20   they're pretty much separate.  I mean I -- right now
21   it's stupid to have two different companies, but I
22   want to kind of pick up, and that's one of the
23   things I'm discussing with John, if I -- we want to
24   start selling also Absen equipment, like new, and
25   then that's what I want to do in the

Page 78

1   IC Technologies.  Right now IC Technologies is
2   inactive.
3       Q.    The $80,000 that Ty Warner gave you,
4   right?
5       A.    Yeah.
6       Q.    Forty of it -- 30 to 40 of it went to the
7   factory, right?
8       A.    Yeah, 30, yeah.
9       Q.    Where is the other 40?
10      A.    That is the -- most of that money is what
11  I have in my bank account.  The $70,000 in the LED
12  Capital bank account came pretty much from that.
13      Q.    Okay.  So you commingled the bank
14  accounts.  That's a bad word.
15      A.    In this case I do because everything -- I
16  am just --
17          (Court reporter clarification.)
18      Q.    You commingled the money; is that
19  correct?
20      A.    I didn't want to use that word.  I mean
21  IC Technologies loaned money to LED Capital, if you
22  want to say it that way.
23      Q.    Did they lend it?
24      A.    Yeah, of course.
25      Q.    Do you have a loan agreement?

Page 79

1       A.    I have a loan agreement.
2       Q.    So IC Technology gave a loan agreement to
3   LED Capital?
4       A.    Correct.
5       THE COURT REPORTER:  Did you say you
6   have a loan agreement?
7       THE WITNESS:  Between me and myself.
8   BY MR. MAZZOLA:
9       Q.    Okay.  A loan between me and myself;
10  that's your answer?
11      A.    Between IC Technologies and LED Capital
12  of course.
13      Q.    And is that loan documented anywhere?
14      A.    Of course.
15      Q.    Let's talk about LED Capital.
16      A.    There is no -- I am not -- I am not --
17  anything that is in IC Technologies is for LED
18  Capital in asset-wise.  So it's not like that I --
19  when I do -- when you see a sale, you zoom in on it
20  and I read in between the lines and you think like,
21  oh, Marcel is then trying to do deals in IC
22  Technologies that I should take assets away from LED
23  Capital.
24          It's like -- it's the opposite really.
25  Any money I make in IC Technologies I put in LED --

Page 80

1   I give, loan, to LED Capital so it can pay as much
2   money as possible to Absen, or to the rent or
3   anything.  Do you understand?  There's no --
4       Q.    I wasn't suggesting otherwise, Marcel.  I
5   was just, you know -- the money is all being mingled
6   as one it sounds to me.
7       A.    And sent to Absen as much as possible.
8       Q.    Okay.  So LED Capital, that bank account
9   is with Wells Fargo in Madison; is that correct?
10      A.    Yes.  If you want me to stop with
11  IC Technologies and do only business in LED Capital,
12  I have no problems doing that, you know.  There's no
13  really -- a real point for me to have
14  IC Technologies right now.
15      Q.    Marcel, I can't make any of those
16  decisions.
17      A.    I'm just letting you know.  You think
18  there's something funny going on.  There's not.  I
19  don't care.  I care if you think that, but there's
20  nothing -- it's not like a vehicle to hide
21  something.  It's just been there between -- before I
22  did this deal with Absen, all I did for six or seven
23  years was selling of new equipment in
24  IC Technologies.  So that's something I was doing.
25  And then I really, you know, went to the rental

Page 81

1   business again, and I stopped doing the sales, but
2   there's nothing else behind it.
3       Q.    For LED Capital, its bank account is at
4   Wells Fargo in Madison, New Jersey, right?
5       A.    Right.
6       Q.    You mentioned earlier that there was a
7   $150,000 receivable.  What was that referring to?
8       A.    PRG.
9       Q.    What is it called?
10      A.    PRG.
11      Q.    R as in "Robert," G as in "George?"
12      A.    Um-hum.  Let me be more specific.
13  $85,000, approximately, is over receivable for a
14  project that I did and they owe me the final
15  payment.  And then some equipment they have not
16  returned, you know, some of the Absen equipment
17  actually, and I should for what they have now
18  returned, they probably -- they pretty much are
19  getting an invoice for what they have not returned,
20  and that should be another thirty or forty thousand
21  dollars so ...
22      Q.    Where is PRG located?
23      A.    They're like a billion dollar company
24  with like 40 offices all over the country.
25      Q.    What does PRG do?

Page 82

1     A.    They are a lighting video company,
2  production company.  They do a lot of like Broadway.
3  They do a lot of the technology for Broadway.
4     Q.    Who were you dealing with at PRG?
5     A.    Give me a second.  Being a little bit out
6  of the business for so many months, the stuff that
7  you always have like available is not anymore.  Give
8  me a second.  Joe Labbe, L-A-B-B-E.
9     Q.    What's his phone number?
10     A.    Well, I really want to give you the phone
11  number of their account receivable people.
12     Q.    You can give me that after you give me
13  Joe's number.
14     A.    You can call these people, you know, if
15  you, I mean -- Absen knows all these people, too,
16  John, but, okay.
17     Q.    No, but I don't know them.
18     A.    810-282-9898.
19     Q.    That's Joe Labbe's number, 282-9898.
20          What is the accounts payable person's
21  name?  What's that person's name?
22     A.    I don't know that, but I have to get -- I
23  will get that to you tomorrow.
24     Q.    Okay.  We'll leave a blank in the
25  transcript.

Page 83

1     A.    Joe is talking to the same people for it
2  because they owe Absen and they're paying a little
3  bit late, too.  So he knows.
4     Q.    Did you ever do transactions through
5  IC Technologies in cash?
6     A.    No, never.
7     Q.    Everything would have been by check or
8  wire, right?
9     A.    Yes.  No cash transactions.
10     Q.    And with LED Capital, would everything
11  have been done by check or wire?
12     A.    We've been doing business in the U.S.
13  since '95, and I have done one cash transaction for
14  $10,000 with a company from Brazil.
15     Q.    Who's "we" doing business in the U.S.
16  since 1995?
17     A.    Me.  And I have done one cash transaction
18  so ...
19     Q.    What other businesses did you have?
20     A.    I had a rental company, XL Video.
21     Q.    XL --
22     A.    -- Video.
23     Q.    Is that still open?
24     A.    It merged into -- PRG acquired it and it
25  merged into -- PRG acquired it and it merged into

Page 84

1  PRG.
2     Q.    When did you sell XL Video to PRG?
3     A.    I never sold XL Video to PRG, but I sold
4  my part of the company, XL Video, to a Belgium
5  investment company, the Gimf, G-I-M-F, and then
6  they --
7     Q.    G-I-M-F.  Hold on.  G-I-M-F, right?
8     A.    Yeah.  And then they sold the whole
9  company, XL Video, to PRG in 2015 I think.
10     Q.    So XL Video is the company you owned with
11  your brother; is that correct?
12     A.    And an investor and all the other
13  partners on part.  We were all shareholders.
14     Q.    So the group of you sold it to G-I-M-F;
15  is that correct?
16     A.    Only I sold my shares in 2011 to the
17  Gimf.  I was the only one who sold out at that time.
18  Everybody stayed on board for another three, four
19  years, and then PRG acquired the shares from the
20  Gimf and all the other shareholders that were still
21  there.
22     Q.    So it's the, T-H-E, Gimf?
23     A.    Gimf I think is the name of the company,
24  G-I-M-F.
25          (Court reporter clarification.)

Page 85

1          THE WITNESS:  Let me quickly Google it.
2  I am not sure -- it's a Belgium company so if it's
3  De it would be D-E.
4          No.  The company is that just Gimv, Gimv
5  private equity.  So G-I-M-V, George, India, Marcel,
6  Victor.
7     Q.    Georgia, India, Marcel, Victor, Gimv?
8     A.    V.  Sorry.  Private equity.  They're a
9  Belgium -- it's maybe one of the biggest Belgium
10  private equity firms.
11     Q.    And how much did you sell your share for
12  in 2011?
13     A.    I think two and a half million, something
14  like that.
15     Q.    Where is that money now?
16     A.    Well, that's like what I have in my
17  house, and then the other part I lost in a business
18  venture in Belgium.
19     Q.    When did you buy your house?
20     A.    2011.
21     Q.    How much money did you put in the house
22  when you bought it?
23     A.    Pretty much -- you know, I bought it for
24  one three fifty.  So I think I put like 800 down.
25     Q.    And you've been there for nine years?

Page 86

1    A.    Yes.

2    Q.    How do you still owe 600,000 on the

3  mortgage?

4    A.    Just whatever the mortgage is.  Of course

5  also property tax that you pay, so whatever -- we

6  have paid the mortgage still the last month, so

7  there's no -- there has not been another period,

8  let's say, that I didn't pay the mortgage.

9    Q.    Okay.

10   A.    That probably means that I didn't put

11  exactly 800 in.  Probably it was more like six or

12  700, whatever the math, you know, whatever the math

13  is.

14   Q.    And then where did the other million --

15  say you put 600,000 in.  Where did the other .9 go?

16   A.    I lost in a business venture in Belgium.

17   Q.    What kind of venture was that?

18   A.    It was a company I started with some

19  engineers to develop our own LED processing system,

20  like the part that makes LED screens work, and

21  they -- then all the Chinese manufacturers buy, in

22  general, from one Chinese company.  So I tried to do

23  something -- you know, give -- develop another --

24  whatever the brain of LED video screens is, the

25  processing, I worked on developing that with my own

Page 87

1  group of engineers in Belgium.

2    Q.    What was the name of that company?

3    A.    It was called the LED Shop.  The Led

4  Shop.

5    Q.    That was a Belgian company or an American

6  company?

7    A.    It was a Belgian company.  It was a BVBA.

8  And I pretty much put a lot of money in that company

9  to develop.  I was the only one investing.  I had

10  like five employees.  I had to buy some of the

11  technology to start with.  And, you know, at the

12  end, it all took way too much time, cost way too

13  much money, and I was just running out of money, and

14  we closed the company down, and it cost me a lot of

15  money.

16   Q.    Let's go back to LED Capital.  How many

17  employees does LED Capital have?

18   A.    Five.

19   Q.    Are they full-time?

20   A.    Now nobody is full-time, but five people

21  are full-time when the business is there.

22   Q.    Okay.  So I assume when the business is

23  there, they work on an hourly basis or a salary

24  basis?

25   A.    Most are salary.

Page 88

1    Q.    What are the names of the employees?

2    A.    Johnny Vickers --

3    Q.    Hold on.  Johnny Vickers, V-I-C-K-E-R-S,

4  right?

5    A.    Yeah.

6    Q.    What's he do?

7    A.    He's kind of -- we working together.

8  He's doing logistics and also sales.

9    Q.    All right.  How much do you pay Johnny

10  Vickers?

11   A.    75,000.

12   Q.    A year?

13   A.    Yes.

14   Q.    Does he get commission?

15   A.    No.  But he wants to make more money so

16  it's -- for now he's just doing it for what we can

17  pay but ...

18   Q.    When is the last time you paid Johnny

19  Vickers?

20   A.    Maybe two weeks ago I sent him some

21  money, but he's getting unemployment now, so I'm not

22  really paying him while he's getting unemployment.

23  But when his unemployment is not there anymore, I

24  have to start, you know, paying him again.

25   Q.    So Johnny Vickers is out on unemployment.

Page 89

1    A.    Right.

2    Q.    Who else --

3    A.    Sorry?

4    Q.    Who else do you have there?

5    A.    Benjamin.

6    Q.    Benjamin what?

7    A.    Harris, H-A-R-R-I-S.

8    Q.    H-A-R-R-I-S.  What's he do?

9    A.    He's a repair guy.

10   Q.    What do you pay him?

11   A.    60,000.  Again, he's on unemployment, but

12  his unemployment ran out because he was like

13  Nashville, he came out of Nashville.  So Nashville

14  stopped the federal unemployment -- or state

15  unemployment, so he wasn't getting, so he's starting

16  back on payroll today.  So he will be on payroll.

17   Q.    Who else?

18   A.    Kirby Vickers.  That's Johnny's son.

19   Q.    What's his name?

20   A.    Kirby Vickers.

21   Q.    Kirby.

22   A.    Yeah, K-I-R-B-Y.  He works in the

23  warehouse and he gets 25,000 a year.  I mean it's

24  Atlanta salary so it's a little lower.

25   Q.    Who else you got?

Page 90

1    A.    Me and my wife, but my wife is limited
2  of -- she's the one I added.
3    Q.    So your wife is an employee, right?
4  You're an employee.
5    A.    Then we have -- there's a guy that just
6  started.  He's actually moving to Atlanta, but he
7  just started before the Covid virus hit, so he's
8  still -- he didn't move yet and he's ready to move
9  when we are ready to take him on, and his name is
10  Erik, E-R-I-K, Sandoz, S-A-N-D-O-Z.  He is in
11  Florida and --
12    Q.    Have you paid him anything yet?
13    A.    Just for work he did before February but
14  not for -- not since that time.  I have no
15  obligation really to him.
16    Q.    Okay.  So I got Johnny, Benjamin, Kirby,
17  your wife Cynthia, you Marcel, and Erik.  Anyone
18  else?
19    A.    No.
20    Q.    No.  What was your average payroll per
21  month?
22    A.    I can tell you.  I can give you --
23    Q.    End of January what was it?
24    A.    What?
25    Q.    You don't know?

Page 91

1    A.    It varied a little bit, but like
2  obviously over the last six months there's
3  nothing -- we didn't do an average payroll.  We
4  just ...
5    Q.    Did you borrow any money through the PPP
6  loan?
7    A.    I told you I did, yes.
8    Q.    You did.  How much did you borrow?
9    A.    Sixty.
10    Q.    60,000?
11    A.    And probably -- you know, a lot of it was
12  used for salaries and rent, so I -- I don't think --
13  I think I.  We'll see.  I think I have to pay some
14  of it back but some of it we let's say used it for
15  the right things, so you can get it waived.  You
16  understand what I mean?
17    Q.    Yep.
18    A.    But who knows how that is all going to be
19  calculated.
20    Q.    How much do you pay your wife?
21    A.    Like over the last years, about 50,000 a
22  year.  But I don't really know how separate -- if
23  that number she still uses or -- best to get that
24  information from the tax returns.
25    Q.    Do you have any objection, Marcel, to

Page 92

1  giving us the tax returns for the last five years?
2    A.    We already agreed that I was going to do
3  that.
4    Q.    Okay.  All right.  But I'd like to see
5  the actual returns.
6    A.    Isn't that we're talking about, yes?
7    Q.    I was looking for the amount of income,
8  you know, on it.
9    A.    Okay.
10    Q.    If you would send me the returns, that
11  would be appreciated.  We'll do a follow-up, though.
12    A.    Okay.
13    Q.    Does LED Capital have any more -- any
14  other receivables as of today other than the
15  150,000?
16    A.    There is -- well, you know, I'm closing
17  this U.S. Open business.
18    Q.    Okay.  But that's not a receivable as of
19  today.
20    A.    Correct.  But I hope tomorrow, you know.
21    Q.    I want to know what receivables, as we
22  sit here today, LED Capital has.
23    A.    That's it.  I am going to double-check,
24  you know, because I -- but there's no substantial
25  amounts.

Page 93

1    Q.    How were payments -- how was payroll
2  managed by LED Capital?
3    A.    My wife processes it over a payroll
4  service.
5    Q.    What service do you use?
6    A.    I don't know.
7    Q.    Is it Paychex?  Is it ADP?
8    A.    I think it's ADP but ...
9    Q.    Does your wife earn any income from her
10  job as a teacher?
11    A.    I mentioned she -- well, right now
12  nothing of course, but right now usually she makes
13  like 10,000 over a year.  It's not a full-time job.
14  It's just a few days.
15    Q.    Are any family members officers or
16  directors of LED Capital?
17    A.    Sorry.  Nobody.  I'm the only one.
18    Q.    Are there any judgments against you?
19    A.    I have -- like related to my Belgium
20  adventure I have some stuff -- not judgments, but I
21  have some legal exposure that I'm dealing with.
22    Q.    Where are those judgments?
23    A.    It's all in Belgium.  I have it in a
24  control thing.  I don't really know exactly my
25  perfect legal position right now.  I do have a

Page 94

1  lawyer there, but I have some exposure there, you
2  know, try to -- basically when I closed that company
3  where I was investing in, we did -- it's a little
4  bit more -- a lot more formal to have a business in
5  Belgium, and we didn't really like file the books,
6  whatever, so there's some liability there.
7       And then I had another shareholder in
8  IC Technologies who I bought out four years ago, and
9  she is still owed some money that I'm also dealing
10  with.
11     Q.   Who is that?
12     A.   I don't want to get into this.
13     Q.   I do want you to get into it.
14     A.   I don't know exactly my legal status
15  there, so I don't really want to -- why is this
16  important for you?
17     Q.   I want to know what the assets and
18  liabilities are.  And if IC Technologies has a
19  liability to someone, I'd like to know what that is
20  and how much.
21     A.   I will provide you more information about
22  that.  I mean it's --
23     Q.   You won't answer it here?
24     A.   I have no secrets about it.  I just --
25  it's really -- I don't want to draw all these people

Page 95

1  in or, you know --
2       Q.   Where does that person live?
3       A.   Florida actually, Miami.  South Beach.
4  Did you ever saw anything?  I mean did you ever saw
5  any records of that?  Or I guess not.
6       Q.   I don't know.  I want to know what you
7  have to say.
8       A.   I'm kind of right now I don't really
9  know.  I don't really know, to be honest, the legal
10  status.  It's something -- I really want to pay her
11  that money, but I'm in this situation now where I
12  cannot pay anybody anything, correct?
13     Q.   I don't know.
14     A.   Well, I can tell you I'm not in a
15  position to pay anybody right now.
16     Q.   How much money is involved?
17     A.   200,000.
18     Q.   Was that a loan that this person gave
19  you?
20     A.   No, I bought her out, a shareholder of
21  IC Technologies that I bought out.
22     Q.   You bought her out.
23     A.   She wanted to leave and I bought her out.
24  I paid her 70 percent or something what I was
25  supposed to pay her, and then I ended up getting

Page 96

1  financial problems, so I still owe her the balance.
2       They're friends, you know.  I consider
3  them friends today.  I know her, it's been forever.
4  It's something I have to deal with, but it's not --
5  it's not an urgency.  There is no legal action or
6  anything.
7       Q.   So you paid her 70 percent.  You still
8  owe her 30 percent.
9       A.   Something like that.
10     Q.   The 30 percent is 200,000.
11     A.   Something like that.
12     Q.   Did she invest 600,000?
13     A.   No.  She was -- we started
14  IC Technologies together and she was a shareholder.
15  She owned 25 percent of the company.
16     Q.   And when did this deal happen that you
17  bought her out?
18     A.   2015, 2014, something like that.
19     Q.   So in 2015 she was a 5 percent
20  shareholder?
21     A.   Twenty-five percent.
22     Q.   Twenty-five.  So in 2015 for
23  IC Technologies, a 25 percent shareholder interest
24  was valued at $600,000?
25     A.   Yeah, because I mean part of it was

Page 97

1  commission, and we were doing two or three million
2  dollar sales some years, you know, so we had -- it
3  was quite a decent amount of revenue.
4       Q.   In 2015.
5       A.   In that time frame, you know, 2013, '14,
6  '15.
7       Q.   Two million dollars a year in revenue?
8       A.   I'm sorry?
9       Q.   Two million a year in revenue?
10     A.   You can see the tax returns, but I think
11  I --
12     Q.   I haven't seen them yet.  You'll show
13  them to me?
14     A.   No, I know, but I think in -- yes, we
15  definitely did.
16          (Court reporter clarification.)
17          THE WITNESS:  Two to three million
18  dollars, approximately, revenue in the 2013-2016
19  time period.  I'm okay with that.  But, again, we
20  going to share the tax returns.
21  BY MR. MAZZOLA:
22     Q.   Does LED Capital file its own tax return?
23     A.   I'm not exactly sure about -- I think so,
24  yes.  I'm almost a hundred percent sure it is.
25     Q.   Does IC Technologies file a tax return?

1   A.   I would say yes.  Yes, I think we -- the
2  two companies and then my own income tax.  I think
3  these are the three things that I pay for, yeah.
4   Q.   Would you give me the tax returns for LED
5  Capital, your personal return, and IC Technologies?
6   A.   Yeah.
7   Q.   You'll agree to do that?
8   A.   Yes.  I have no problems sharing that
9  with you.
10   Q.   And you'll give me them to me back to
11  2013?
12   A.   I don't care.  I really -- you can see
13  everything.  There's really -- I've told you that
14  before, you know.  I -- you wanted to do this
15  deposition, but I -- I have nothing to hide from
16  you.
17      I mean I -- I don't like to share
18  everything you're asking right now, all this stuff,
19  but it doesn't mean I have secrets.  It just
20  means -- feels like somebody going through my dirty
21  laundry, you know?  And it is that a little bit,
22  correct?
23   Q.   So other than that liability, the one to
24  the lady in Florida whose name you won't give me yet
25  of approximately 200,000, does either LED Capital or

1  IC Technologies have any other liabilities to anyone
2  other than Absen?
3   A.   I owe -- I borrowed -- when I was having
4  the problems in Belgium, I borrowed $100,000 --
5  euros from my brother.
6   Q.   Okay.  When was that?
7   A.   That was three years ago.
8   Q.   Okay.
9   A.   There are some vendors from
10  IC Technologies that I have -- that are owed money
11  from quite a long time ago.  I have not -- nobody of
12  these vendors are like collecting or taking legal
13  steps.  Kind of I assume they wrote it off.  But I'm
14  not sure what we did on our books.
15      So there are people, companies let's say,
16  that are owed money for maybe a couple of years in
17  IC Technologies.
18   Q.   Approximately how much?
19   A.   What?
20   Q.   Approximately how much?
21   A.   I think maybe altogether 50,000,
22  something like that.  You know, I always kind of
23  want to go back and pay these people.  I'm not sure
24  if I ever will.  It all depends on what my financial
25  future holds.  But there's nobody let's say in the

1  last two years that has sent us any legal documents
2  or anything or even collection calls or anything
3  like that.
4      So I don't know.  I don't know how you
5  want to deal with this.  I don't think it's a
6  liability, but it could be if they suddenly all show
7  up again.  But that is not in LED Capital.  That's
8  in IC Technologies.  That mainly applies in
9  IC Technologies.  In LED Capital I don't have that.
10   Q.   Are you a party to any pending lawsuits
11  other than this one, this matter?  Yes or no?
12   A.   No.
13   Q.   What about your wife?
14   A.   No.
15   Q.   What about LED Capital?  Anything?
16   A.   No, no.
17   Q.   And what about IC Technologies?
18   A.   No.
19   Q.   What about the other companies we've
20  talked to, any pending lawsuits?
21   A.   The only thing else I have is the thing
22  in Belgium and the thing with in Florida with my
23  Norah, my ex-shareholder.
24   Q.   What was her name?
25   A.   Norah, N-O-R-A-H.  So you care.

1   Q.   Can you give us her last name?
2   A.   You know, I just don't -- can I suspend
3  on this one, and if it really becomes a big issue,
4  then I will let you know?
5   Q.   We'll leave a blank there.  You know, I
6  mean, if it becomes a big issue, we'll let you know,
7  too.
8      Is Norah a family member or a friend of
9  family?
10   A.   No, no.  It's just her husband used to
11  work for me at XL Video for 20 years -- or let's say
12  12 years, 13 years.  So it's not family, but I
13  consider them good friends.  And obviously they got
14  a little bit pissed at me, but they also understand
15  my situation and they're hopeful that my -- the
16  rental business, you know, gets successful.
17      MR. MAZZOLA:  Who's still on the line?
18  Rich, you're still on the line, right?
19      MR. LERNER:  I am on the line.
20      MR. MAZZOLA:  I see two non-video
21  participants.  Rylie, are you still on the line or
22  is John on the line now?  Maybe Rylie just didn't
23  check out.  She should probably be asleep now.  It's
24  almost two o'clock in the morning in China.  1:30 I
25  should say.

Page 102

1    THE WITNESS:  Maybe she's just recording
2  it you know, who knows, if that's even possible.
3    MR. MAZZOLA:  I don't know if she's
4  doing that.  I'm not sure you can do it so ...
5    Okay.  Can we take maybe about a
6  15-minute break now?  This will be a little bit of a
7  longer break.  I just want to regroup, talk to Rich,
8  see where we are, what's next and what's --
9    THE WITNESS:  How much do you think you
10  have left then after the 15?
11    MR. MAZZOLA:  My MO is usually it's over
12  after that, you know.
13    THE WITNESS:  So this is just for you to
14  make sure you have all your bases covered?
15    MR. MAZZOLA:  Just to make sure I
16  haven't forgot again anything and make sure that
17  there's nothing we need to follow -- what the
18  follow-up will be and all that, Marcel, okay?
19    THE WITNESS:  Thank you, John.
20    (A recess was taken from 1:29 p.m.until
21  1:31 p.m.)
22    THE WITNESS:  I want to sign it.  I want
23  to read it and sign it.
24    (A recess was taken from 1:29 p.m. until
25  1:46 p.m.)

Page 103

1    MR. MAZZOLA:  So at this point, Marcel,
2  I have no further questions for you.  Marcel, we did
3  serve the other subpoena asking for things.  Do you
4  remember that?
5    THE WITNESS:  No, but if you do, then
6  just e-mail it to me.
7    MR. MAZZOLA:  We'll send it to you
8  again.  We're not going to hold you to not --
9  technically you were supposed to produce those
10  today, but we're not going to hold you to that
11  because, you know, we've been working on it, but
12  we'll send you --
13    THE WITNESS:  What is it?  The tax
14  returns you mean?
15    MR. MAZZOLA:  You were served with a
16  notice to inspect documents, et cetera, et cetera.
17  We'll get it to all to you again, Marcel, okay?
18    THE WITNESS:  But can you give me an
19  example, or I mean I cannot even think of what it
20  could be?
21    MR. MAZZOLA:  I think we were asking for
22  things like the tax returns.  I have to find it
23  myself.
24    THE WITNESS:  Okay.
25    MR. MAZZOLA:  I'll get you whatever more

Page 104

1  you need to answer in terms of documents, okay,
2  Marcel?
3    We're off the record.  I think we're
4  done.
5    (The deposition concluded at 1:48 p.m.)
6    * * * * *

Page 105

1    C E R T I F I C A T I O N
2
3    I, Patricia R. Frank, a Certified Court
4  Reporter, Certified Realtime Reporter, and Notary
5  Public of the State of New Jersey, do hereby certify
6  that I reported the deposition in the
7  above-captioned matter; that the said witness was
8  duly sworn by me; that reading and signing was
9  requested; that the foregoing is a true and correct
10  transcript of the stenographic notes of testimony
11  taken by me in the above-captioned matter.
12    I further certify that I am not an
13  attorney or counsel for any of the parties, nor a
14  relative or employee of any attorney or counsel
15  connected with the action, nor financially
16  interested in the action.
17
18    _____
19    Patricia R. Frank, CCR #XI01021
     Notary Public #2405975 Exp. 03/22/21
20
21  Dated:  July 21, 2020
22
23
24
25

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

Notice Date: 07/31/2020

Deposition Date: 7/20/2020

Deponent: Marcel Dekeyzer

Case Name: Absen v. LED Capital

Page:Line          Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES: